```
              UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF KENTUCKY
```
**CENTRAL DIVISION** AT **LEXINGTON**

CIVIL ACTION NO. 07-202-JMH

SHARON M. HALL,                                              PLAINTIFF,


VS:                      **MEMORANDUM OPINION AND ORDER**


WARDEN ARNOLD, ET AL.,                                      DEFENDANTS.

              ****   ****   ****   ****   ****

Sharon M. Hall ("Hall") has submitted a *pro se* 42 U.S.C. § 1983 complaint, together with a motion for leave to proceed *in forma pauperis* and a sworn statement of her institutional account balances for the last six months. [Dkt. 2, 5, 6] The Court has granted Hall's motion to proceed *in forma pauperis* by separate Order.

The Court screens civil rights complaints pursuant to 28 U.S.C. § 1915A. *McGore v. Wrigglesworth*, 114 F.3d 601, 607-08 (6th Cir. 1997). As Hall is appearing *pro se*, her complaint is held to less stringent standards than those drafted by attorneys. *Burton v. Jones*, 321 F.3d 569, 573 (6th Cir. 2003); *Hahn v. Star Bank*, 190 F.3d 708, 715 (6th Cir. 1999). During screening, the allegations in her Complaint are taken as true and liberally construed in her favor. *Urbina v. Thoms*, 270 F.3d 292, 295 (6th Cir. 2001). But the court must dismiss a case at any time if it determines the

action (I) is frivolous or malicious, or (ii) fails to state a claim upon which relief can be granted.  28 U.S.C. § 1915(e)(2).

I.   **BACKGROUND**

In her Complaint, Hall alleges that on or about on July 7, 2006, she was transferred from another penal facility to the Otter Creek Correctional Complex ("OCCC").  Upon her arrival, prison guards took her aside from the other prisoners, questioned her regarding three particular inmates, and informed her that if she ever had problems with any of these inmates, she should contact one of them for assistance or protection.  It appears that at this time Hall was offered the opportunity to be placed in protective custody for her own safety, an offer Hall refused because she wished to have more time in the "yard" for recreation than protective custody would permit.  Hall did request that she be placed in a different dormitory than these three inmates.  At this time Hall was assigned to the "Bravo" dormitory apart from these three inmates.

Two weeks later, Hall was moved to the segregation unit while officials investigated her possible participation in prohibited activities.  After one week in the segregation unit, Hall was returned to the general population and assigned to the "E" wing dormitory.  Because this was the same dormitory which housed the three inmates about whom Hall was concerned, Hall contacted various prison guards and the chief of security to be moved to another location.  Hall alleges that she was again "threatened" with

placement in protective custody for three days.  Hall again refused placement in protective custody because she was told that after the three days she would simply be returned to the "E" wing dormitory.

It appears that Hall was housed in the same dormitory as these three prisoners, or at least shared certain common areas with them, for the next two and a half months without incident.  It further appears that on one or more occasions Hall was relocated to another area of the prison, but after Hall sought return to the general population where prisoners are afforded more freedom, prison officials returned her to an area where these prisoners were either housed or had access to the same common areas.

On October 20, 2006, Hall got into an altercation with inmate Troutman, one of the three inmates about whom Hall had expressed concern to prison officials.  Hall indicates that she did not "fight back" against Troutman, but merely waited for other inmates and guards to stop the fight.  As a result of the conflict, Hall suffered a black eye, injuries to her lip and mouth, a leg injury, and had hair pulled out of her scalp.  Hall was taken to an outside medical center for X-rays, which did not reveal any broken bones. Hall then remained in medical segregation for four days.

On October 26, 2006, Hall filed an informal grievance in which she asserts that she repeatedly advised guards about her difficulties with other prisoners but that nothing was done.  On November 8, 2006, Chief of Security Hodge responded, asserting that

after staff moved Hall to a different dorm in the prison apart from these inmates, Hall repeatedly asked to be moved back to the area where the other inmates were located. Hall also refused to accept the guards' offer to place her in protective custody. A notation on that response indicates that it was not presented to Hall by the grievance aide until November 14, 2006, and was acknowledged by Hall on November 16, 2006.

On November 17, 2006, a five-member Grievance Committee held a hearing and rejected Hall's grievance, noting that "it is policy to offer [protective custody] to inmates who feel threatened or sign a P.C. refusal. We feel policy was followed." On November 20, 2006, upon review the warden upheld the Grievance Committee's determination. On November 29, 2006, Hall appealed to Commissioner John D. Rees. On December 19, 2006, the Commissioner issued a letter upholding the warden's decision. His letter succinctly stated:

> I have reviewed your grievance. As stated in the informal response, you were offered Protective Custody if you felt your safety was in danger and you refused. Information received at this office indicates that you were the individual that provoked the confrontation. If you feel you safety is still in jeopardy you still have the option of requesting Protective Custody. No further response necessary.

Hall did not file any grievance with respect to her medical care.

On July 11, 2007, Hall sent a letter to Commissioner Rees, in which she describes these events and indicates that although she is

now housed separately from inmate Troutman, she wants to be housed in the dorm where Troutman is located because she would prefer to be housed there. While the prison staff "asked me if I wanted P.C.. I did not feel that I should have been denied what little freedom that we have so I denied P.C., I felt that I should be allowed time on the yard like everyone else."

## II. DISCUSSION

Hall's Complaint presents two discrete claims. The first is a challenge to the adequacy of her medical care, which she describes as "malpractice." The second is a claim based upon the failure of prison guards and officials to protect her against assault from another inmate.

As previously noted, Hall did not file any grievance regarding the adequacy of her medical care. The record reveals only inmate requests to staff for haircut appointments and one seeking Rogain to help her hair grow back. None of these constitute the exhaustion of the formal grievance process expressly set forth in Corrections Policies and Procedures ("CPP") 14.6(II)(K). Federal law requires a prisoner challenging prison conditions pursuant to 42 U.S.C. § 1983, *Bivens*, or other federal law to exhaust all available administrative remedies before filing suit in federal court. 42 U.S.C. § 1997e(a); *Porter v. Nussle*, 534 U.S. 516, 532 (2002). This exhaustion must be accomplished in full compliance with the applicable regulations, and failure to do so bars the claim on the

merits. *Woodford v. Ngo*, 126 S.Ct. 2378 (2006). Because Hall did not invoke the prison's grievance procedures and cannot now comply with the timing requirements imposed by CPP 14.6, her medical claim must be dismissed with prejudice for failure to properly exhaust her administrative remedies.

In addition, Hall's medical claim would fail on the merits. When an inmate challenges the sufficiency of the medical care she receives in prison, she must demonstrate that the medical concerns involved are sufficiently serious to warrant constitutional protection, and that a prison official's response to that need demonstrates that he is "deliberately indifferent" to that need. *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). The second requirement is only met where the prison official's actions demonstrate that he denied or delayed access to needed medical care or intentionally interfered with the treatment once prescribed. *Caldwell v. Moore*, 968 F.2d 595, 602 (6th Cir. 1992). Even if the plaintiff or an outside doctor recommends a different course of treatment than that given by a prison doctor, the treatment actually provided does not evidence "deliberate indifference" so long as that care meets "minimal standards of adequacy." *McCracken v. Jones*, 562 F.2d 22, 24 (10th Cir. 1977); *Holmes v. Sheahan*, 930 F.2d 1196, 1199 (7th Cir. 1991) (quoting *Benson v. Cady*, 761 F.2d 335, 339 (7th Cir. 1985)).

After the altercation, Hall was first given treatment at the prison and then taken to an outside medical facility for X-rays by private physicians to ensure that she had no broken bones. Hall was then kept in medical isolation for the next 3-4 days. Because Troutman had torn out some of Hall's hair, it appears Hall was permitted to get her hair cut more frequently and cut short for both aesthetic and medical reasons. While Hall requested that she be given a prescription for Rogain to encourage hair regrowth, this request was denied on January 25, 2007. To the extent Hall's allegations suggest she suffered any injury from her medical care, it must be the delay in the regrowth of her hair. The record before the Court indicates that prison officials promptly and aggressively responded to Hall's medical needs, and any delay in her recovery caused by the prison's refusal to prescribe Rogain for Hall is not sufficiently "serious" medically to implicate Eighth Amendment concerns. *Estelle*, 429 U.S. at 104.

Hall's second claim is that prison officials failed to adequately protect her safety notwithstanding their actual knowledge of her conflict with Troutman and two other inmates. Such a "failure to protect" claim requires proof that (1) the inmate faced a substantial risk of serious harm; (2) the defendants were "deliberately indifferent" to that risk; and (3) the defendants' indifference was the cause of the inmate's injuries. *Hamilton v. Leavy*, 117 F.3d 742, 746 (3d Cir. 1997).

There is not sufficient information in the record to make any determination regarding the seriousness of the threat these three prisoners posed to Hall, nor whether the potential harm she faced was serious enough to implicate Eighth Amendment concerns. The Court can therefore make no conclusions regarding Hall's ability to satisfy the first element.

What the record does clearly show, however, is that while OCCC officers were aware of the threat to Hall, they responded by repeatedly offering her the option of entering Protective Custody. The record further demonstrates that Hall refused these invitations not because Protective Custody would be ineffective to protect her from the very harm she feared, but rather because the conditions of Protective Custody were too restrictive for Hall's liking. In particular, Hall twice expressed that she declined Protective Custody because she would not get sufficient "yard time" or be afforded the same liberties given to prisoners in the general population.

In short, Hall does not contend that prison officials failed to offer her an adequate means of protection, but rather that they failed to provide her sufficient protection in the less restrictive environment of the general population. Prison officials are not required to guarantee a prisoner's safety under terms and conditions dictated by the prisoner. A prisoner is entitled to adequate protection from harm, but is not entitled to direct prison

officials on the means to accomplish it. Having repeatedly refused to accept reasonable means of protecting herself through Protective Custody, Hall cannot now seek to hold prison officials liable for harm to herself that she could reasonably foresee in light of her refusal. *Zatler v. Wainright*, 802 F.2d 397, 403 (11th Cir. 1986) (inmate who refused offer of protective custody because he found conditions unfavorable failed to establish prison officials' deliberate indifference under the Eighth Amendment for failure to protect him from sexual assault by another inmate where conditions of protective custody were not so offensive or constraining that such custody would independently constitute cruel and unusual punishment); *Nolen v. Goord*, 2007 WL 627504 (2d Cir. 2007) (dismissal of failure to protect claim affirmed where plaintiff failed to present evidence that offer of protective custody three months before assault was not a reasonable response to the risk presented).

## CONCLUSION

Accordingly,

**IT IS ORDERED**,

1. This action is **DISMISSED**, *sua sponte*, with prejudice.

2. The Court certifies that any appeal would not be taken in good faith. 28 U.S.C. § 1915(a)(3); *McGore v. Wrigglesworth*, 114 F.3d 601, 610-11 (6th Cir. 1997).

3. This is a **FINAL** and **APPEALABLE** order.

This the 13th day of November, 2007.



Signed By:
*Joseph M. Hood*
Senior U.S. District Judge